UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFERY CAPEN,                                    Case No. 21-12465

        Plaintiff,                              F. Kay Behm
v.                                               United States District Judge

SAGINAW COUNTY, *et al.*,

        Defendants.
_____ /

**OPINION AND ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT (ECF No. 22)**

## I.    PROCEDURAL HISTORY

Plaintiff, Jeffery Capen, filed this civil rights complaint pursuant to 42 U.S.C.

§ 1983 against Defendants, Saginaw County and Robert Bellemen, on October 19,

2021.  (ECF No. 1).[1]  Saginaw County employed Capen as a maintenance worker.

(*Id.* at PageID.2).  Capen filed this complaint against the County and County

Controller Robert Belleman alleging a violation of his procedural due process

rights under the Fourteenth Amendment to the United States Constitution.  (*Id*. at

PageID.7-10).  More specifically, Capen claims that his liberty interest in refusing

_____

[1] This matter was originally assigned to District Judge Nancy G. Edmunds and was reassigned to the undersigned on February 6, 2023.  *See* Text-Only Order of Reassignment dated 2/6/23.

unwanted medical treatment was violated when he was required to undergo a

fitness for duty evaluation and asked to produce records regarding his medical

care and treatment to maintain his position after a complaint was submitted to

the County stating that Capen had made threats of violence against co-workers.

(*Id*. at PageID.8-10).  Defendants filed a motion for summary judgment, which is

fully briefed.  (ECF Nos. 22, 24, 25, 26).  This court held a hearing on the motion

on May 10, 2023 via videoconference.

For the reasons set forth below, the court **GRANTS** Defendants' motion for

summary judgment.

## II.    FACTUAL BACKGROUND

On December 9, 2020, Nicholas Cooper, a Saginaw County employee in the

Maintenance Department, sent a letter to interim Maintenance Department

Director Annette Taylor detailing a conversation he had with Capen.  (ECF No. 22-

2, 12/09/20 Cooper Letter; ECF No. 22-3, Cooper Dep, at 17:16-24:20).  The letter

stated that Capen was "very, very pissed," and told Cooper that "he could not

wait for Annette to be gone."  (ECF No. 22-2).  The letter detailed threats Capen

allegedly made to Cooper regarding both Taylor and the Controller's Office:

> I replied, "Jeff you do not mean that." Jeff replied "fuck
> that bitch, and fuck them motherfuckers in the
> Controllor [sic] office! He said (Jeff) "one day It would

> not surprise me If they all ended up dead![”] I said
> “Come on Jeff you don't mean that.[”] He replied
> [”]fuck that Nick I could do it.” I mean it I could!  I
> understand we do not have a Director these days and
> we need one.  There are employees other than myself
> that Jeff has spoken to on this issue.  They have spoke
> to me feeling there [sic] feeling is Jeff has been acting
> hostile and very pissed.  I spoke to Annette on this 12-6-
> 2020.

*Id*.  Taylor gave the letter to Saginaw County Risk Manager Kelly Suppes, who

forwarded it to Belleman.  (ECF No. 22-4, Belleman Dep, at 10:5-11:10).  Belleman

forwarded it to the County Undersheriff, who advised it needed to be

investigated, and Capen should be recommended counseling to determine the

basis for the hostility.  (*Id*. at 15:14-16:5).

After consultation with the County's civil counsel, Belleman placed Capen

on paid administrative leave “pending completion of an investigation into the

statements of violence you made” and decided to send Capen for a fitness for

duty examination to investigate whether he could perform his job safely.  (*Id*. at

16:16-18:1; ECF Nos. 22-5, 22-6, Belleman Letters to Capen).[2]  Capen says that

Defendants did not sufficiently indicate what he did wrong because there was no

---

[2]  Capen argues that this was just a “scheme” to create a justification for taking an
adverse action against him, pointing to a letter with comments made by Capen's wife about
brain lesions.  Capen characterizes this as an improper and illegal use of the medical
examination provision in the ADA, but he does not make an ADA claim in his complaint.  (ECF
No. 25, PageID.385, citing Ex. 10).

description of the statements made or to whom the statements were made and

there was no description of any evidence to support the allegations.  Capen later

admitted that he made disparaging remarks about Taylor, but he denied during

his deposition that he made any threats.  (ECF No. 22-7, Capen Dep, at 102:7-

106:7).[3]

Nothing in the record suggests that Capen voiced any objections to

appearing for the fitness-for-duty evaluation before it occurred.  Capen met with

Dr. Mark Zaroff, Ph.D., L.P. on December 15, 2020, for the fitness for duty

evaluation.  (ECF 22-8, Zaroff Report).   Dr. Zaroff reported that Capen exhibited

noticeable tremors in his hands during the evaluation.  *Id*. at 2.  According to Dr.

Zaroff, Capen reported that he has brain lesions and had been evaluated

neurologically for the possibility of Parkinson's Disease, which had been ruled out.

*Id*.  Capen also advised that he was treating with a neurologist for the tremors,

and an MRI showed he had "white calcium spots on the brain."  *Id*.  Dr. Zaroff

reported that Capen was advised by his doctor that he might have had mini

strokes and is at risk for continued mini strokes.  *Id*.  Capen disputes telling Dr.

---

[3] Capen also points to the testimony of two other Saginaw County employees who testified that Cooper was generally known to tell unbelievable stories and that they did not believe Capen made threats.  (ECF Nos. 25-7, 25-8).  Nothing in the record suggests that the opinions of these employees were shared with Defendants during the fitness for duty evaluation process.

Zaroff these things and says that he only reported having asymptomatic calcium deposits on his brain likely due to high blood pressure and that his father had been at risk for mini strokes.  (ECF No. 25-2, pp. 78-79, 117, 121).  Capen advised Dr. Zaroff that he suffered from "severe memory loss."  (ECF No. 22-8).  He also told Dr. Zaroff that he does not recall anything he said to Cooper.  *Id*. at 2-3. Capen explained that he carries a notepad around on the job to take notes and an iPad to take pictures so he can remember what projects he completed and worked on each day.  *Id*. at 3.  He stated that his co-workers take notes for him, which he transfers to a computer, and then forgets about.  *Id*.  Capen also told Dr. Zaroff that he was losing track of his hygiene routine in the shower and had developed a specific routine at home to ensure that he completes tasks, including writing down instructions for himself.  *Id*.  He reported forgetting how to set up machinery for his long-time woodworking hobby and having to write down the instructions.  *Id*.

Capen explained to Dr. Zaroff the basis for his hostility to Taylor, saying that he found the fact that she did not want employees with COVID in the office to be "offensive" and described her as "crazy" when talking about working with her 20 years ago.  *Id*. at 4.  He explained that she ordered him around to show others how fast she could make him jump.  *Id*.  According to Capen, she had also recently

told Capen's wife (a secretary in the maintenance department) not to apply for

the Director's position because she was unqualified.  *Id*. at 4-5.  Capen further

complained that his job classification had been changed from "a three to a two"

(as a result of a job study implemented by the Controller), and that as a result, he

lost about $3,200 in pay, while people in the Controller's Office received two pay

raises at the same time.  *Id*. at 4.  Dr. Zaroff reported that Capen dismissed

Cooper's allegation of threatening comments as "locker room banter," but

admitted that talking about wanting people dead would not typically be part of

that banter.  *Id*.

Dr. Zaroff administered two tests during the evaluation: the Mini-Mental

Status Examination (MMSE) and the Minnesota Multiphasic Personality Inventory

(MMPI II-RF).  *Id*. at 5-6; ECF No. 22-9, Zaroff Dep, at 9:1-4.  Dr. Zaroff chose the

MMSE because Capen reported being diagnosed with brain lesions and

complaints concerning memory.  (ECF No. 22-9, at 9:5-12).  That test assesses

basic cognitive functions and attention, concentration, numerical ability, memory,

and orientation to person, place, and time.  *Id*. at 9:13-20.  Dr. Zaroff says that he

chose the MMPI 2-RF because it is an excellent instrument to prove and/or rule

out significant mental illness.  *Id*. at 10:5-25.  He explains that the test helps to

identify personality or substance abuse concerns that need further investigation.

*Id*. at 10:5-11:9.  According to Dr. Zaroff, Capen had trouble with aspects of the

MMSE, particularly those related to auditory memory.  (ECF No. 22-8, at 6).  The

MMPI II-RF showed significant scale elevations in the area of somatic problems,

which Dr. Zaroff found consistent with Capen's genuine medical difficulties

causing neurological complications.  *Id*.  Ultimately, Dr. Zaroff reported that

Capen's neurological condition *could* be causing personality changes and/or

reducing his ability to inhibit responses resulting in impulsive, inappropriate

statements.  *Id*. at 7.  He noted that Capen appeared to lack insight into the

amount of stress he was under, and seemed to easily lose track of conversation,

which is consistent with an individual with a neurological disorder.  *Id*.

Dr. Zaroff also reported that Capen's test results were consistent with

substantial memory loss.  *Id*.  He opined that Capen's memory loss created a risk

of misinterpreting instructions, forgetting instructions, or forgetting how to

engage in a procedure with machinery that could potentially cause injury to

himself and others.  *Id*.  Dr. Zaroff concluded that Capen was not able to perform

the work described in his current job description and was not "fit for duty."  *Id*.

Dr. Zaroff also opined that although Capen denied making the threats and a

history of violence, "it is likely that he did make the reported threat toward

others."  *Id*. at 8.  He advised it was possible that Capen's neurological condition

was affecting his decision making, impulse control, and personality.  *Id*.  He

recommended that Capen undergo a full neuropsychological evaluation.  *Id*. at 7.

Dr. Zaroff established the risk level regarding Capen's potential for workplace

violence as "moderate," and advised that the risk should be "taken seriously."  *Id*.

at 8; ECF No. 22-9, at 33:1-23.[4]  Dr. Zaroff sent his report to the County, and

Belleman forwarded it to Capen.  (ECF No. 22-10, 02/01/21 Letter).

Based on Dr. Zaroff's report, Belleman sent Capen a letter on February 1,

2021, advising him that Dr. Zaroff opined that Capen was not able to perform the

work described in his current job description, and recommended a

neuropsychological evaluation to confirm.  *Id*.  Belleman advised Capen that the

neuropsychologist would require authorizations for the release of his current

medical records to evaluate the conditions he described to Dr. Zaroff.  *Id*.

Belleman also relayed Dr. Zaroff's recommendation that Plaintiff attend individual

counseling and provided the contact information of Saginaw Psychological

---

[4] Capen expends much energy in his brief describing the inaccuracy of Dr. Zaroff's reporting of Capen's statements along with Dr. Zaroff's purportedly erroneous conclusions, and further claiming he exceeded the scope of his expertise.  Dr. Zaroff recommended further testing and evaluation precisely because some of his conclusions were preliminary and outside the scope of his expertise.  The additional testing and medical record review were all part of the fitness for duty evaluation.  It is difficult to countenance Capen's complaints about Dr. Zaroff when he failed to participate in the remainder of the evaluation, which could have cleared up any disputes regarding his actual medical and/or psychological condition.  And, to the extent that Capen suggests Dr. Zaroff was not independent, he points to no evidence in the record to support that suggestion.

Associates to schedule an appointment. *Id*. As Belleman explained in his deposition, in making these requests and recommendations, he deferred to Dr. Zaroff's expertise. (ECF No. 22-4, at 28:24-30:20). Despite receiving this letter, Capen did not schedule the neuropsychological examination or the individual counseling and did not provide the authorizations to release his medical records because he "did not have to and didn't want to." (ECF No. 22-7, at 136:13-137:6; 138:11-139:7).

A week later, Capen contacted his primary care physician, who reported: "Received a call from the patient regarding his medical records. He has been evaluated psychologically recently. I informed him that we will not release his medical records to anybody unless his consent is there." (ECF No. 22-11, 02/08/21 PCP Record; ECF No. 22-7, at 81:19-83:25, 137:7-138-11). On March 9, 2021, Capen obtained a return-to-work letter from his primary care physician. (ECF No. 22-7, 86:1-10; ECF No. 22-13, 03/09/21 Record; ECF No. 22-14). Plaintiff told his physician that he was having "no symptoms of tremors" whatsoever, and that his "memory had returned." *Id*. at 86:1-87:11. Yet, three months later Capen told his neurologist that he was still experiencing "tremors and memory problems." *Id*. at 85:4-25; ECF No. 22-15. Capen admitted that the tremors never subsided. *Id*. at 85:17-18.

On March 17, 2021, Belleman sent a letter to Capen stating that the County

scheduled him for a neuropsychological examination, as recommended by Dr.

Zaroff.  (ECF No. 22-12, 03/17/21 Letter).  Belleman again asked Capen to execute

an authorization for his medical records for the neuropsychologist.  *Id*.  Capen

admits he received and understood this letter, but he did not appear for the

scheduled examination and refused to provide his medical records because he did

not feel he should have to.  (ECF No. 22-7, at 141:6-142:9; 142:10-143:10).

On August 26, 2021, defense counsel sent Capen's counsel a letter directing

Capen, for the third time, to provide authorizations for the release of his medical

records, and to participate in an "interactive accommodations meeting" on

September 8, 2021.  (ECF No. 22-16, 8/26/21 Letter).  This meeting was scheduled

to determine Capen's ability to perform essential job functions with or without

accommodations.  *Id*.  The letter specifically advised that Capen's refusal to

participate would be considered "abandonment of his position."  *Id*.  Capen

received the letter and refused attend the meeting.  (ECF No. 22-7, at 143:11-16)

At his deposition, Capen stated he felt it was a "set up" and the union leadership

was conspiring against him.  *Id*. at 143:17-144:23.  He also believed that, though

he needed no accommodations, Belleman would force something on him anyway.

*Id*. at 145:16-147:3.  Capen acknowledges that he did not call the union to see if

they would represent him; he did not request to file a grievance; and he did not

respond to the letter advising Mr. Belleman that he could perform his duties, or

that he did not intend to abandon his job.  Id. at 146:14-148:24.  Instead, he

ignored the letter, and did not attend the meeting.  *Id*. at 144:14-148:24.

On September 28, 2021, Belleman sent a letter advising Capen that the

County considered his failure to attend the accommodations meeting as an

abandonment of his position.  (ECF No. 22-17, 09/28/21 Letter).  The letter

advised that the County intended to terminate his employment.  *Id*.  On

September 30, 2021, Belleman supplemented the letter identifying "good cause"

to terminate Capen's employment based on abandonment of his position and

refusal to attend and participate in the accommodation process, leading to the

conclusion that he could not perform the essential functions of his position (as

described by Dr. Zaroff).  (ECF No. 22-18, 9/30/21 Letter).  The letter further

advised prior to termination of his employment, on request, Capen was entitled a

hearing.  *Id*.  The letter provided Capen until October 7, 2021, to request the

hearing, otherwise his employment would be terminated effective October 8,

2021.  *Id*.  Capen admits that he received this letter but did not respond.  (ECF No.

22-7, at 145:2-13, 148:2-24).  The County terminated Capen's employment,

effective October 8, 2021.  *Id*. at 149:7-8.

III.    **DISCUSSION**

A.    <u>Standard of Review</u>

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-

moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004).  In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court

must determine whether a jury could reasonably find that the plaintiff's factual

contentions are true by a preponderance of the evidence.  *See id.* at 252–53.

Finally, if the nonmoving party fails to make a sufficient showing on an essential

element of its case for which it carries the burden of proof, the movant is entitled

to summary judgment.  *Celotex*, 477 U.S. at 323.  The court must construe Rule 56

with due regard not only for the rights of those "asserting claims and defenses

that are adequately based in fact to have those claims and defenses tried to a

jury," but also for the rights of those "opposing such claims and defenses to

demonstrate in the manner provided by the Rule, prior to trial, that the claims

and defenses have no factual basis."  *Id*. at 327.

      B.    <u>Procedural Due Process</u>

          1.    *Legal Standards*

Belleman argues that Capen's due process claim is barred by qualified

immunity.  The doctrine of qualified immunity means that "'[g]overnment officials

performing discretionary functions generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *Caldwell*

*v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982)).  A defendant bears the burden of pleading qualified immunity,

but the plaintiff bears the burden of showing that the defendant's conduct

violated a right so clearly established that a reasonable official in his or her

position would have clearly understood that he or she was under an affirmative

duty to refrain from such conduct.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.

2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the

plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test to determine whether

qualified immunity applies.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The first

part of the test involves a determination of whether the facts of the case, viewed

in the light most favorable to the plaintiff, "show the officer's conduct violated a

constitutional right."  *Id*.  If the first question is resolved in the affirmative, then

the court should decide "whether the right was clearly established."  *Id*.

"[C]learly established means that, at the time of the officer's conduct, the

law was sufficiently clear that every reasonable official would understand that

what he is doing is unlawful."  *Dist. Of Columbia v. Wesby*, 138 S. Ct. 577, 589

(2018) (internal quotations omitted).  The right must be defined at the

appropriate level of specificity to determine whether it was clearly established at

the time the defendants acted.  *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing

*Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Indeed, "courts must not

'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Moderwell v. Cuyahoga Cnty., Ohio*, 997 F.3d 653, 660 (6th Cir. 2021) (quoting *Wesby*, 138 S. Ct. at 590).  On the other hand, it "defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012).  An official action, therefore, need not have previously been held unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Wilson*, 526 U.S. at 615 (quoting *Anderson*, 483 U.S. at 640).

Typically, "[a] clearly established constitutional violation requires on-point, controlling authority or a robust consensus of cases of persuasive authority." *Ortega v. U.S. Immigr. And Customs Enf't*, 737 F.3d 435, 439 (6th Cir. 2013).  "In determining whether a right was clearly established, we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, and we ask whether these precedents 'placed the … constitutional question beyond debate.'" *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  In rare circumstances, however, "the Supreme Court has held that there does not need

to be a case directly on point." *Moderwell*, 997 F.3d at 660 (citing *Taylor v. Riojas*,

151 S. Ct. 52, 53 (2020)).  "[T]here can be the rare 'obvious case,' where the

unlawfulness of the officer's conduct is sufficiently clear even though existing

precedent does not address similar circumstances." *Id.* (quoting *Wesby*, 138 S. Ct.

at 590).

If both parts of the qualified immunity test are resolved in the affirmative,

then the doctrine of qualified immunity does not apply, and the case can proceed.

The court may address the two factors in whichever order it deems appropriate

based on several factors, not the least of which is judicial economy.  *Pearson v.*

*Callahan*, 555 U.S. 223, 227 (2009).  As the Sixth Circuit has observed, "[t]his

generally means that 'we are free to consider those questions in whatever order

is appropriate in light of the issues before us.'" *Jones v. Byrnes*, 585 F.3d 971, 975

(6th Cir. 2009) (quoting *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir.

2009)).

>    2.    *Analysis*

The Due Process Clause of the Fourteenth Amendment provides that no

state shall "deprive any person of life, liberty, or property without due process of

law."  U.S. Const. amend. XIV, § 1.  "In order to establish a procedural due process

claim, a plaintiff must show that (1) he had a life, liberty, or property interest

protected by the Due Process Clause; (2) he was deprived of this protected

interest; and (3) the state did not afford him adequate procedural rights prior to

depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438

F.3d 595, 611 (6th Cir. 2006) (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir.

1999)).  "'Government employment amounts to a protected property interest

when the employee is 'entitled' to continued employment,'" and the source of

this right may be found in a written policy that allows for dismissal only for "just

cause." *Nunn v. Lynch*, 113 F. App'x 55, 58–59 (6th Cir. 2004) (quoting *Bailey v.*

*Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997)).  "The 'root

requirement' of the Due Process Clause," is "'that an individual be given an

opportunity for a hearing before he is deprived of any significant property

interest,'" and "'[t]his principle requires some kind of a hearing prior to the

discharge of an employee who has a constitutionally protected property interest

in his employment.'" *Medlin v. City of Algood*, 355 F. Supp. 3d 707, 714 (M.D.

Tenn. 2019) (quoting *Rodgers v. 36th Dist. Ct.*, 529 F. App'x 642, 648 (6th Cir.

2013) (quoting *Cleveland Bd. of Educ. V. Loudermill*, 470 U.S. 532, 542 (1985)).  To

determine the amount of process due in a particular case, courts balance three

factors: "[f]irst, the private interest that will be affected by the official action;

second, the risk of an erroneous deprivation of such interest through the

procedures used, and probable value, if any, of additional or substitute

procedural safeguards; and finally, the Government's interest …." *Mathews v.*

*Eldridge*, 424 U.S. 319, 335 (1976).

Capen's due process claim is narrowly drawn.  He explains his claim as

follows:

> When Plaintiff was required to submit to the
> psychological examination, his right to refuse medical
> treatment was deprived.  Even a temporary, nonfinal
> deprivation is still a deprivation in terms of the
> Fourteenth Amendment. *Fuentes v. Shevin*, 407 U.S. 67,
> 84-85 (1972).  <u>It is immaterial to the issue of liability
> what happens afterwards; the deprivation had already
> occurred.</u>  While Defendants claim Plaintiff was
> terminated solely for his failure to attend an
> accommodations meeting, which was not requested by
> Plaintiff and related to a "disability" Plaintiff did not
> have, Defendant Belleman's actual letters informing
> Plaintiff of his termination refer to multiple "reasons,"
> including the reasons set forth above, which relate to
> Plaintiff's refusal to attend the neuropsychological
> evaluation and refusal to provide additional medical
> information.  Furthermore, one must remember that the
> request for Plaintiff to undergo a neuropsychological
> examination, to authorize disclosure of additional
> medical information, and to attend an accommodations
> meeting, and Plaintiff's termination all flow from the
> false information reported in the psychological
> evaluation report.  But for Defendants' failure to provide
> Plaintiff procedural due process, none of the bases for
> Plaintiff's termination would have occurred.

(ECF No. 25, PageID.398-399) (emphasis added).  Here, Capen's interest is not the property right to continued employment, but his claimed liberty interest in refusing medical treatment.  Thus, Capen asserts a protected liberty interest in refusing the fitness for duty evaluation with Dr. Zaroff, the counseling and neuropsychological examination, and the medical records review recommended by Dr. Zaroff.  (ECF No. 1, PageID.7-10).  Capen claims he was never given the opportunity to argue that none of this was necessary.  *Id*.  Thus, his entire due process claim rises or falls on whether he can show he had a protected liberty interest in refusing a fitness for duty evaluation without a hearing.  He cannot.

Capen cites several cases to support his claimed liberty interest in refusing medical treatment.  None of these cases involve a fitness for duty examination required by an employer.  *See Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990) (The U.S. Constitution does not forbid the state from requiring clear and convincing evidence of a patient's desire to cease hydration and nutrition); *Washington v. Harper*, 494 U.S. 210, 221-222 (1990) (Prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."); *Vitek v. Jones*, 445 U.S. 480, 494 (1980) (transfer to mental hospital coupled with mandatory behavior modification treatment implicated

liberty interests); *Parham v. J.R.*, 442 U.S. 584, 600 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment").  Each of these cases involve invasive medical treatment or confinement.  Capen does not identify any case standing for the proposition that a public employee has a liberty interest in refusing a fitness for duty examination, such that some type of hearing is required before a public employer may require such an examination.  The court too has been unable to find any cases stating that procedural due process mandates a hearing *before* an employer may require a fitness for duty examination.  Accordingly, Capen has not met his burden of showing that his right to a hearing before a fitness for duty evaluation is clearly established.  The cases regarding forced medical treatment outside the employment context did not give Belleman sufficient notice that his conduct was unlawful, and he is, therefore, entitled to qualified immunity.  Given that Capen circumscribes his due process claim as entirely dependent on his right to refuse a fitness for duty evaluation, and this right is not clearly established, his due process claim must fail.

Further, there are a host of cases holding that "the governmental interest in having fit personnel in important public positions overrides the private interest in continued employment such that due process does not require a pre-

deprivation hearing." *Cozad v. Ill. Dep't of Corr.*, 2018 WL 2758261, at *10 (C.D.

Ill. Apr. 17, 2018) (collecting cases).  While these cases do not directly address

Capen's claimed liberty interest refusing medical treatment, they are more

analogous to the present circumstances than the cases on which Capen relies,

which involve forced, invasive medical treatment or confinement against one's

will for medical treatment.  In each of the cases identified in *Cozad*, no pre-

deprivation hearing was required even where the employee was suspended

*without pay*.  Here, not only was there no suspension *without pay*, but several of

these cases concluded that there was no due process violation, despite the lack of

pre-deprivation hearing, because there was a "substantial assurance that the

deprivation [wa]s not baseless or unwarranted" based on a "finding by an

independent doctor following a fitness for duty evaluation."  *Id*. at *10 (citations

omitted) (citing *Newman v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 594 F.2d 299,

300–304 (2d Cir. 1979) (holding the plaintiff teacher was not entitled to a pre-

deprivation hearing where she was placed on a leave of absence without pay due

to mental instability after a fitness for duty evaluation concluded she was "[n]ot

fit at present for teaching duty"; "the risk of harm that might occur if a teacher

believed to be mentally unfit were permitted to continue teaching is too great to

insist on retention while the issue of mental fitness is being resolved"); *Ceko v.*

*Martin*, 753 F. Supp. 1418, 1422–26 (N.D. Ill. 1990) (holding the plaintiff 911

dispatcher was not entitled to a pre-deprivation hearing where he was placed on

a leave of absence without pay after a fitness for duty evaluation concluded he

suffered from schizophrenia and was "definitely unfit")).  The suspension without

pay and without a hearing was lawful *because* a fitness for duty evaluation was

conducted.  These cases suggest that the fitness for duty examination is

essentially part of any purported process due under such circumstances.

Indeed, in *Cozad*, the court found a due process violation because the

deprivation of the plaintiff's pay was not accompanied by adequate assurances

that it was not baseless or unwarranted.  *Id*. at *10.  In other words, the

employer's failure to conduct a pre-deprivation fitness for duty evaluation caused

the process to be inadequate.  There, the plaintiff was deprived of her salary

based on two sentences from her FMLA (Family Medical Leave Act) certification

about her ability to perform her job duties while she was having a panic attack.

*Id*.  The court concluded that "these two sentences were not an adequate

substitute for a fitness for duty evaluation."  *Id*.  The court further concluded that

these sentences did not provide "independent corroboration" that the employer's

evidence was "sufficiently reliable" to deprive the plaintiff of her pay without an

opportunity to be heard.  *Id*.  Accordingly, a pre-deprivation fitness for duty

evaluation was necessary, under the facts of *Cozad*, to ensure that the

deprivation of the plaintiff's pay was not baseless or unwarranted.  Lastly, the

*Cozad* court observed that while a fitness for duty evaluation would have intruded

on the governmental interest, if an "employer perceives a significant hazard in

keeping the employee on the job, it can avoid the problem by suspending with

pay."  *Id*. at *10 (quoting *Loudermill*, 470 U.S. at 544–45).  Here, not only did

Defendants seek to conduct an independent fitness for duty evaluation by

medical professionals, they also did not deprive Capen of his pay while this

process played out.  Thus, it seems that Defendants took precisely the course of

action necessary to assure that Capen's due process rights were protected and

not infringed.

Moreover, Capen failed to take advantage of the available due process

remedy found in the grievance procedure in the CBA, either before or after he

submitted in part to the fitness for duty evaluation.  The Sixth Circuit has

repeatedly held that "the traditional grievance procedures in a collective

bargaining agreement … satisfy due process."  *Hudson v. City of Highland Park*,

943 F.3d 792, 801 (6th Cir. 2019) (citing *Kuhn v. Washtenaw Cty*., 709 F.3d 612,

623–24 (6th Cir. 2013); *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004); *Buckner*

*v. City of Highland Park*, 901 F.2d 491, 497 (6th Cir. 1990)).  The CBA here includes

such a procedure.  More specifically, the CBA provides that "[i]t is mutually

agreed that all grievances, disputes, or complaints arising under and during the

term of this Agreement involving any employees not in an elected department …

shall be settled in accordance with the procedures herein provided."  (ECF No. 22-

20, CBA, Art. 5(B), § 1).  The CBA provides for a four-step grievance process.  First,

an employee may either discuss the issue with their supervisor or ask the Steward

to do so within 10 working days of the occurrence of the issue.  *Id*. at § 4.  At Step

2, if the grievance is not resolved verbally, it must be put in writing and presented

to the department head, and a written reply must be provided.  *Id*.  If the

grievance is not resolved at Step 2, the written grievance is then presented to the

Personnel Department and a grievance meeting conducted between the Union

and the Employer, after which the Personnel Department issues a written reply.

*Id*.  Before proceeding to Step 4, the parties have the option of submitting the

grievance to mediation.  *Id*.  At Step 4, the grievance proceeds to arbitration.  *Id*.

Capen maintains that any issues relating to the fitness for duty evaluation

were not grievable because the grievance procedure applies only to disputes

"arising under" the CBA, which does not contain any provision regarding sending

employees to fitness for duty evaluations.  Capen also argues that the CBA

requires a grievance to refer to the specific provision of the CBA that has been

violated, and there is no provision in the CBA regarding fitness for duty

evaluations.  As to the latter argument, grievances regarding health and safety are

specifically excepted from the requirement to identify the specific provision of the

CBA under which a grievance arises.  (ECF 22-20, Art. 5(B), § 2(a)) ("A grievance

shall refer to the specific provision or provisions of this Agreement alleged to have

been violated, *except grievances concerning the health and safety of employees*."

(emphasis added)).  More importantly, this provision suggests that health and

safety issues are, in fact, grievable under the CBA.  A fitness for duty evaluation

would surely fall within the scope of "health and safety."  Indeed, the CBA states

that one of its purposes is to provide for the operation of the services provided by

the employer under methods that will further the "safety of its employees."  *Id*. at

PageID.316, Preamble to CBA.  Accordingly, Capen's objections to submitting to

the fitness for duty examination fall with the broad scope of the CBA's definition

of grievance as "any dispute, controversy, or difference between (a) the parties,

or (b) the EMPLOYER and an employee or employees on any issue(s) with respect

to, on account of, or concerning the meaning, interpretation, or application of this

Agreement, or any terms or provisions thereof."  *Id*. at Art. 5(B), § 2.  And nothing

in the CBA suggests that Capen was not permitted to pursue the grievance

procedure *before* submitting to the fitness for duty examination with Dr. Zaroff.

Thus, any pre-deprivation process that was due to Capen was easily addressed through the grievance procedure in the CBA, which he declined to take advantage of.  Accordingly, his procedural due process claim must also fail for this reason. *See Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004) (If constitutionally sufficient administrative procedures are available, a plaintiff's failure to take advantage of them cannot give rise to a due process claim.).

C.      *Monell* Claim Against the County

"To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  In other words, "[a] municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'"  *Id*. (quoting *Monell*, 436 U.S. at 694).  There are four traditional ways of proving the existence of an illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Wright v. City of Euclid, Ohio*, 962 F.3d

852, 880 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 828

(6th Cir. 2019)).

However, if there no underlying constitutional violation, then there can be

no *Monell* liability.  As the court explained in *Ashcroft v. Iqbal*, 556 U.S. 662, 767

(2009), there is no vicarious or *respondeat superior* liability under § 1983.  Thus,

for example, in the context of a municipality, a plaintiff cannot establish the

municipality's liability unless he shows that "deliberate action attributable to the

municipality directly caused a deprivation of federal rights."  *Board of County*

*Comm. V. Brown*, 520 U.S. 397, 415 (1997).   Rather, in the context of a claim

against a municipality, a plaintiff must establish both (1) an underlying violation of

his constitutional rights, and (2) that the violation resulted from the municipality's

own deliberately indifferent policies.  *See Collins v. City of  Harker Height*s, 503

U.S. 115, 120 (1992) (explaining that "proper analysis requires us to separate two

different issues when a § 1983 claim is asserted against a municipality: (1)

whether plaintiff's harm was caused by a constitutional violation, and (2) if so,

whether the city is responsible for that violation."); *City of Los Angeles v. Heller*,

475 U.S. 796, 799 (1986) (*per curiam*) ("If a person has suffered no constitutional

injury at the hands of the individual police officer, the fact that the departmental

regulations might have authorized the use of unconstitutionally excessive force is

quite beside the point."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th

Cir. 2001) ("If no constitutional violation by the individual defendants is

established, the municipal defendants cannot be held liable under § 1983.")

(citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Nallani v.*

*Wayne County*, 2015 WL 6795945 (E.D. Mich. Nov. 6, 2015) (dismissing defendant

Wayne County because plaintiff failed to establish a constitutional violation by

the individual defendants)).  As set forth above, Capen has not established that

Belleman violated his constitutional rights.  Accordingly, his policy claims too must

fail.

## IV.     CONCLUSION

For the reasons set forth above, Defendants' motion for summary

judgment is **GRANTED**.

**SO ORDERED**.

Date: June 21, 2023                          s/F. Kay Behm
                                             F. Kay Behm
                                             United States District Judge